UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2006 APR 13 P 4: 01

U.S. DISTRICT COURT
HARTFORD, CT.

STERLING INVESTMENT PARTNERS, L.P. )
285 Riverside Avenue, Suite 300 )
Westport, Connecticut 06880-4806 )
 )
and )
 )
STERLING INVESTMENT PARTNERS )
SIDE-BY-SIDE, L.P. )
285 Riverside Avenue, Suite 300 )
Westport, Connecticut 06880-4806 )
 )
                    *Plaintiffs*, )
 )
          v. )
 )
JAMES BROWN )
711 Lasell Drive )
Champaign, Illinois 61820 )
 )
and )
 )
DOYLE A. WOOD )
606 Page Circle )
Mt. Juliet, Tennessee 37122 )
 )
and )
 )
ALLEN W. COLE III )
6314-C Eagle Ridge Lane )
Alexandria, VA 22314 )
 )
                    *Defendants*. )
 )

Case No. 306CV0584WWE

APRIL 13, 2006

## COMPLAINT

Plaintiffs, Sterling Investment Partners, L.P., and Sterling Investment Partners Side-By-Side, L.P. by way of this Complaint against defendants James Brown, Doyle A. Wood and Allen W. Cole III, allege as follows:

## NATURE OF THE ACTION

1. In a series of transactions occurring on or about May 3, 2004 (collectively, the "Acquisition"), plaintiffs acquired from defendants a majority equity interest in a privately held corporation known as Community Research Associates, Inc. ("Old CRA"). The Acquisition was consummated by plaintiffs in reliance on numerous oral and written representations by defendants and Old CRA regarding the company's financial condition and business prospects.

2. After the Acquisition had been consummated and new management took over operations of the company, plaintiffs discovered that defendants and Old CRA had misrepresented the true financial condition and business prospects of the company prior to and at the time of the Acquisition in order to induce plaintiffs to pay a highly inflated price for their stock in the company.

3. Plaintiffs bring this action under the federal securities laws for money damages and equitable relief. Defendants should be required to disgorge the financial windfall they derived from their misconduct, and they should be required to compensate plaintiffs for their losses.

## PARTIES

4. Plaintiff Sterling Investment Partners, L.P. ("Sterling I") is a Delaware limited partnership with its principal place of business in Westport, Connecticut.

5. Plaintiff Sterling Investment Partners Side-By-Side, L.P. is a Delaware limited partnership with its principal place of business in Westport, Connecticut. Sterling I and Sterling Investment Partners Side-By-Side, L.P. are hereafter referred to together as "Sterling."

6. Defendant James Brown ("Brown") is an individual who, upon information and belief, is a citizen and resident of Champaign, Illinois. At all relevant times, Brown served as Chairman of the Board of Directors of Old CRA.

7. Defendant Doyle A. Wood ("Wood") is an individual who, upon information and belief, is a citizen and resident of the State of Tennessee. At all relevant times, Wood served as President, Chief Executive Officer and a member of the Board of Directors of Old CRA

8. Defendant Allen W. Cole III ("Cole") is an individual who, upon information and belief, is a citizen and resident of the Commonwealth of Virginia. At all relevant times, Cole served as a Vice President and member of the Board of Directors of Old CRA.

## RELATED PARTIES

9. CRA, Inc. (f/k/a Community Research Associates, Inc.) (hereafter, "CRA") is a Delaware corporation with its principal place of business in Alexandria, Virginia. CRA is a company that principally contracts with federal government agencies to provide training, exercises, and planning support for federal, state and local emergency responders to reduce vulnerability to terrorist acts.

10. Community Research Associates, Inc. ("Old CRA") was an Illinois corporation that merged with and into CRA in connection with the Acquisition.

11. Kyle B. Olson ("Olson") is an individual who, upon information and belief, is a citizen and resident of the Commonwealth of Virginia. At all relevant times, Olson served as a Vice President and member of the Board of Directors of Old CRA. Olson is not a defendant to this lawsuit because he and the plaintiffs have resolved their disagreements.

12. Geoffrey Nagler ("Nagler") is an individual who, upon information and belief, is a citizen and resident of the Commonwealth of Virginia. At all relevant times, Nagler served as a Vice President and Member of the Board of Directors of Old CRA. Nagler is not a defendant to this lawsuit because he and the plaintiffs have resolved their disagreements.

13. Defendants Brown, Wood and Cole together owned 75 percent of the outstanding stock of Old CRA at all relevant times prior to the Acquisition. Defendants, together with Olson and Nagler, are sometimes referred to collectively as the "Original Shareholders." As a result of their high-level positions with Old CRA, and the fact that they owned all the company's outstanding stock in the period prior to execution of the merger and acquisition described below, each of the Original Shareholders had access to adverse information about Old CRA's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

14. It is appropriate to treat each of the Original Shareholders and the defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed to plaintiffs as alleged herein are the collective actions of each of them. Each of the Original Shareholders, as the result of their high-level positions with Old CRA, directly participated in the management of the company, was directly involved in the day-to-day operations of the company at the highest levels, and was privy to confidential proprietary information concerning the company and its business, operations, products, growth, financial

4

statements, and financial condition, as alleged herein. The Original Shareholders participated in drafting, producing, reviewing, approving, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding Old CRA, and approved or ratified those statements.

15. Each defendant was, at all times relevant to this lawsuit, a person who, directly or indirectly, controlled Old CRA within the meaning of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa (the Securities Exchange Act of 1934) and 28 U.S.C. § 1331. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that the plaintiffs are citizens of Connecticut and Delaware, and the defendants are citizens of Illinois, Tennessee and Virginia, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

17. Venue is proper in this Court pursuant to 15 U.S.C. § 78aa. In addition, venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district.

## FACTUAL BACKGROUND

18. Prior to the transactions that are the subject of this lawsuit, Old CRA was a company that provided training, exercise and planning support for federal, state and local emergency responders in order to reduce vulnerability to terrorist attacks. Old CRA principally contracted with federal government agencies to provide these services. Its largest and most important

customer was the U.S. Department of Homeland Security, Office of Domestic Preparedness ("ODP").

19. In the Fall of 2002, the Original Shareholders owned all of the outstanding capital stock of Old CRA, to wit: Brown owned 35% of the company's stock; Wood owned 35% of the company's stock; Cole owned 5% of the company's stock; Olson owned 20% of the company's stock; and Nagler owned 5% of the company's stock.

20. In the period of time that the Original Shareholders and Sterling discussed the possibility of an acquisition, and leading up to the consummation of Sterling's acquisition of a majority equity interest and investment in the business of Old CRA, the defendants exercised full and unfettered control over all the operations and finances of Old CRA, and each of them played a "hands-on" role in day-to-day operations.

### Initial Discussions Regarding the Sale of Stock

21. In or about the Fall of 2002, Olson, on behalf of the Original Shareholders, contacted Sterling and inquired whether Sterling would be interested in investing in Old CRA and providing liquidity to the Original Shareholders with respect to some or all of their shares in the company. This overture was made by telephone inquiry to Sterling's Michael Barr at his office in Connecticut. At the time, Mr. Barr was an associate with Sterling; he has been a vice president of Sterling since 2004.

22. Sterling responded that it might be interested in pursuing such a transaction provided that Old CRA's future growth and business prospects met Sterling's requirements, and provided that the parties could reach agreement on the value of Old CRA.

23. Over the course of the succeeding months (the "Negotiation Period"), Sterling engaged in numerous discussions with the Original Shareholders aimed at determining the value and future business prospects of Old CRA, as well as the terms and conditions under which Sterling might invest in the company and provide liquidity to the Original Shareholders. These discussions, described in detail below, occurred during face-to-face meetings in Connecticut and elsewhere, as well as during telephone calls and electronic mail messages to and from Sterling's offices in Connecticut.

### The Defendants Made
### Materially False and Misleading Statements
### to Sterling to Induce Sterling to Purchase Equity in CRA

24. During the Negotiation Period, the Original Shareholders provided Sterling with numerous documents that purported to reflect the true and complete financial picture and future business prospects of Old CRA. These documents were provided in order to inform Sterling regarding the value of the company, and to induce Sterling to purchase a majority equity interest in the company.

25. On or about February 21, 2003, Olson, on behalf of Old CRA and the Original Shareholders, sent Sterling's Michael Barr (at his Connecticut office) a document called a "Funnel Model" that purported to show revenue projections and growth rates for Old CRA for the years 2003 through 2006 (hereafter, the "February Funnel"). At the time Olson provided the February Funnel to Sterling, the Original Shareholders knew, or were reckless in not knowing, and failed to disclose to Sterling that the assumptions upon which the revenue projections included therein were based were false, objectively unreasonable and unrealistic, resulting in highly inflated revenue projections. The Original Shareholders provided the February Funnel to

7

Sterling in order to mislead Sterling regarding the value of the company, and to induce Sterling to purchase a majority equity interest in the company. A copy of the February Funnel is attached hereto as Exhibit A, and is incorporated as if set forth in full.

26. Similarly, on or about December 1, 2003, Olson, on behalf of Old CRA and the Original Shareholders, sent Sterling's Michael Barr (at his Connecticut office) a document that Olson represented to be an updated and current version of the February Funnel (the "December Funnel"). Like its predecessor, the December Funnel purported to show revenue projections and growth rates for Old CRA for the years 2003 through 2006. At the time Olson provided the December Funnel to Sterling, the Original Shareholders knew, or were reckless in not knowing, and failed to disclose to Sterling that the assumptions upon which the revenue projections included therein were based were false, objectively unreasonable and unrealistic, resulting in highly inflated revenue projections. The Original Shareholders provided the December Funnel to Sterling in order to mislead Sterling regarding the value of the company, and to induce Sterling to purchase a majority equity interest in the company. A copy of the December Funnel is attached hereto as Exhibit B, and is incorporated as if set forth in full.

27. Not later than December 8, 2003, the defendants had actual knowledge that the projections provided to Sterling in the December Funnel were highly inflated in that they were based on false, objectively unreasonable and unrealistic assumptions. It was on that date, that Nagler sent an e-mail to each defendant stating that the projections in the December Funnel reflected "double counting" and "pie in the sky hope." Nagler circulated to each defendant a corrected funnel – with dramatically reduced projections – but he emphasized in his e-mail that

he had not alerted Sterling's Michael Barr to the problem. A copy of the Nagler e-mail is attached hereto as Exhibit C, and is incorporated as if set forth in full.

28. Rather than provide Sterling with the true facts regarding the December Funnel, the defendants deliberately concealed the fact that the projections in the December Funnel were based on flawed assumptions and painted a false picture of future profitability.

29. During the Negotiation Period, the Original Shareholders made numerous other statements to Sterling regarding the financial picture and future business prospects of Old CRA. The purpose of these statements also was to mislead Sterling regarding the value of Old CRA, and to induce Sterling to pay the Original Shareholders a highly inflated price for their shares in the company.

30. In or about the last week of April 2004 (*i.e.* the final week preceding the Acquisition), Olson, on behalf of Old CRA and the Original Shareholders, participated in a telephone call with Sterling's M. William Macey Jr. and Michael Barr, as well as Bruce M. Lawlor and Harriette A. Terbell. The purpose of that call was to review the latest status of the Original Shareholders' 2004 revenue projections for Old CRA. During that call, the participants discussed a revenue projection spreadsheet (attached as Exhibit D and incorporated as if set forth in full) that was based on assumptions provided by Olson. During that call, Olson affirmed the reasonableness of the assumptions, and the accuracy of the projections, including the projection of more than $35 Million in revenue for calendar year 2004. In fact, however, Olson and each defendant knew, or were reckless in not knowing, and failed to disclose to Sterling that those projections were based on false, objectively unreasonable and unrealistic assumptions.

### Sterling Acquires Old CRA
### in a Stock Transaction with the Original Shareholders

31. On or about May 3, 2004, Sterling, CRA, Old CRA and the Original Shareholders entered into a series of written agreements, pursuant to which Sterling consummated the Acquisition. These agreements included a Share Purchase Agreement ("SPA"), a Plan of Merger and Reincorporation, a Stockholders' Agreement, a Registration Rights Agreement and a Certificate of Incorporation of CRA, all dated as of May 3, 2004 (collectively, the "Closing Documents"). The Closing Documents are attached as Exhibits E, F, G, H and I, respectively, and are incorporated as if set forth in full.

32. The Acquisition involved essentially concurrent transactions whereby the Original Shareholders in effect sold a portion of their equity interest in Old CRA to Sterling, which also invested additional funds in the business. Initially, Old CRA merged into CRA, with CRA as the surviving corporation and the Original Shareholders owning all of its outstanding capital stock. Sterling then purchased a majority equity interest in CRA for $5,083,333, of which $2,171,292 was paid to the Original Shareholders to redeem a portion of their CRA shares. Additionally, the Original Shareholders received promissory notes in the aggregate principal amount of $1,000,000, and a contingent agreement to be paid an additional aggregate amount of $778,708 provided that CRA met certain milestones. (CRA ultimately failed to meet those milestones as a result of the Original Shareholders' own mismanagement of the company, which they had concealed from Sterling.)

33. As part of the Acquisition, defendant Brown received $980,910 in cash, along with a promissory note in the principal amount of $451,763, and a contingent agreement by CRA to make additional cash payments totaling $351,792 provided that CRA met certain milestones.

Brown also received a Consulting Agreement pursuant to which CRA agreed to pay him no less than $50,000 per year, at a rate of $1,000 per day, for consulting services.

34. As a result of the Acquisition, defendant Wood received $788,773 in cash, along with a promissory note in the principal amount of $363,273, and a contingent agreement by CRA to make additional cash payments totaling $282,884 provided that CRA met certain milestones. Wood also received an Employment Agreement pursuant to which CRA agreed to pay him $156,280, plus bonuses, to serve as an employee of the company.

35. As a result of the Acquisition, defendant Cole received $118,172 in cash, along with a promissory note in the principal amount of $54,425, and a contingent agreement by CRA to make additional cash payments totaling $42,381 provided that CRA met certain milestones. Cole also received an Employment Agreement pursuant to which CRA agreed to pay him $136,500 per year, plus bonuses, to serve as an employee of the company.

36. In addition to the foregoing, approximately $1 million of the consideration paid by Sterling was applied to repay indebtedness of Old CRA that the Original Shareholders personally had guaranteed, and which they had had caused Old CRA to incur shortly before the Acquisition in order to pay themselves a dividend of approximately $900,000. An additional approximately $1 million of the consideration paid by Sterling was invested in CRA to provide working capital and to cover transaction expenses of all parties, including the Original Shareholders.

37. Upon closing of the Acquisition, the Original Shareholders retained a minority equity interest in CRA, in addition to the consideration described above.

### Old CRA Made Materially False and Misleading
### Statements to Sterling to Induce Sterling to Purchase
### Equity in the Company

38. As is customary in a transaction of this type, Old CRA made certain representations as an inducement for Sterling to consummate the Acquisition. Those representations were set forth in the SPA, and principally concerned the financial statements, condition and business prospects of Old CRA. Sterling relied upon the accuracy of these representations when it entered into the SPA and consummated the Acquisition. Sterling later learned that many of these representations were materially false and misleading, and that Old CRA and the Original Shareholders knew, or were reckless in not knowing, of that falsity at the time of the Acquisition.

39. In the SPA, Old CRA represented that certain of its financial statements that it had provided to Sterling were accurate . This was false because Old CRA had provided Sterling with incomplete, misleading and inaccurate income statement data for the first four months of 2004. Old CRA and the Original Shareholders knew, or were reckless in not knowing, of that falsity at the time of the Acquisition.

40. Prior to closing of the Acquisition, Old CRA represented to Sterling that its revenues for the first four months of 2004 exceeded $6 million, placing the company on track to slightly exceed 2003 revenues, and that approximately one-third of that revenue consisted of training-related revenues from ODP. In fact, however, Old CRA and the Original Shareholders knew, but failed to disclose to Sterling, (i) that ODP had *terminated* the training services provided by Old CRA, (ii) that as a result, the company's residual work was *declining* during the initial four months of 2004, (iii) that Old CRA received substantially reduced training requirements from ODP during the first four months of 2004, and (iv) that in order to convey the false impression

12